**E-FILED**
Thursday, 15 November, 2012  03:26:45 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| WILLIAM K. HAWKINS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 10-CV-2111** |
| | ) | |
| RODNEY S. MITCHELL, in his individual | ) | |
| capacity, and JAMES M. BOWERSOCK, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#36) filed by Defendants, Rodney S. Mitchell and James M. Bowersock, and the Motion for Summary Judgment (#45) filed by Plaintiff, William K. Hawkins. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, this court concludes that Defendants are entitled to summary judgment on Plaintiff's claims regarding his arrest and are not entitled to summary judgment on Plaintiff's claims regarding the use of excessive force. This court concludes that there are genuine issues of material fact which preclude summary judgment on the excessive force claims. Therefore, Defendants' Motion for Summary Judgment (#36) is GRANTED in part and DENIED in part. Because Defendants are entitled to summary judgment on some of Plaintiff's claims and factual issues prevent the entry of summary judgment on the remaining claims, Plaintiff's Motion for Summary Judgment (#45) is DENIED.

FACTS[1]

On May 31, 2008, Plaintiff and Sarah Bumgarner (Sarah)[2] spent the day and evening together.  Plaintiff testified at his deposition that they had been dating since 2005, but that Sarah probably also saw other people.  Both Plaintiff and Sarah consumed alcohol during the time they were together on May 31, 2008, and were at Plaintiff's house that evening.  Plaintiff testified that he had Red Bull and vodka that night and that he and Sarah split a twelve pack of beer, but perhaps did not finish all of it.[3]  Sarah stated in her affidavit that Plaintiff brought up the topic of a serious relationship and "became very upset, started to yell and became verbally abusive" because she did not agree with him.  Sarah stated that she told Plaintiff she needed to leave the house because she was scared he would try to hurt her as he had done in the past.  Sarah stated that she began packing up some clothing that she had brought to Plaintiff's house to launder.  She said that, as she was packing the clothes, Plaintiff yelled at her to get out of his house and began throwing her clothes into the front

---

[1]  The facts are taken from the parties' statements of undisputed facts and the documents submitted by the parties.  This court has only included facts which are adequately supported by evidence in the record.  This court also notes that, because the issues raised in both Motions for Summary Judgment are so closely related, it has considered all of the parties' arguments in making its rulings, whether they were advanced in briefing Defendants' Motion for Summary Judgment or Plaintiff's Motion for Summary Judgment.

[2]  Sarah's affidavit states that her name is now Sarah Gerth.

[3]  During his deposition taken on October 19, 2011, Plaintiff had a great deal of difficulty recalling some of the details of what occurred on May 31, 2008.  In his affidavit, which he signed about seven months later, on May 16, 2012, Plaintiff stated facts regarding the events of May 31, 2008, with much more certainty.  For example, he claimed in his affidavit that he had one Red Bull and vodka and drank two to three beers that evening.  This court agrees with Defendants that this court cannot consider statements in Plaintiff's affidavit which contradict his deposition testimony.  When deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken. Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998); Nuzzi v. St. George Comm. Consol. Sch. Dist. No. 258, 688 F. Supp. 2d 815, 831 (C.D. Ill. 2010).  Plaintiff has made no attempt to explain why his recollection had improved as of the date of his affidavit.

yard.[4]  Sarah stated that, as she was scrambling to leave the house, she could not find her car keys.  She asked Plaintiff to give her the keys and he told her he did not have them and continued to be verbally abusive.  Sarah stated that she called the police so that they could help her retrieve her keys so that Plaintiff would not try to hurt her.  Sarah stated that she advised the dispatcher that Plaintiff was intoxicated and could be violent when he was intoxicated.

At his deposition, Plaintiff denied ever striking Sarah or being verbally abusive to her but stated that she could be verbally abusive when she was drinking. Plaintiff testified that he and Sarah had a disagreement around 10:30 the evening of May 31, 2008.  He said that he started bugging her about seeing him more often and she got annoyed and started yelling. Plaintiff testified that Sarah was drunk and became very verbally abusive when she was drunk.  According to Plaintiff, Sarah had a habit of lying and blaming others when she was drunk.  Plaintiff testified that they had a discussion for about 40 minutes and Sarah began gathering her things and left, taking her laundry with her.  In his affidavit, Plaintiff stated that the front door of his house locks automatically when closed.  Plaintiff testified that he went upstairs to bed and did not recall Sarah telling him she did not have her car keys.

At 11:37 p.m. on May 31, 2008, a call came to the Metropolitan Computer Aided

---

[4]  In another example of Plaintiff's affidavit contradicting his deposition testimony, Plaintiff stated in his affidavit that Sarah "was throwing her things out into the front yard, in a drunken frenzy."  This is directly contradicted by Plaintiff's testimony that Sarah was gathering her things and then walked out the door, taking her laundry with her, and then he went directly to bed.  Based on Plaintiff's sworn deposition testimony, he could not have seen Sarah throwing her things out into the front yard.

Dispatch (METCAD) from Sarah indicating a domestic situation at Plaintiff's address.[5] According to the affidavit of Deanne Brazelton, the METCAD dispatcher who received the call, she labeled the call a domestic situation based upon the information she received from Sarah. Brazelton stated that Sarah reported that there was an argument between Plaintiff and her and that Plaintiff had locked her out and her keys were in the residence. Brazelton stated that she asked Sarah if alcohol was involved and Sarah replied that both of them were intoxicated. Then, consistent with her training and METCAD's routine practice, Brazelton asked Sarah if Plaintiff had any weapons in his possession and Sarah responded that she was not sure. Brazelton then entered into the computer the location of the domestic dispute, that there had been an argument between Sarah and Plaintiff, that both were intoxicated, and that it was unknown if any weapons were in the possession of Plaintiff. Brazelton also entered that Sarah had stated that Plaintiff had a history of abusiveness toward her. Brazelton stated that, whenever there is a domestic dispute in progress, it is to be labeled "Priority 1" which indicates to the officer that this call deserves the highest priority. In that situation, the computer automatically recommends that two officers proceed to the scene. Jennifer Frost, another dispatcher for METCAD, radioed police officers that there was a Priority 1 incident in progress at Plaintiff's address.

Defendant Mitchell was the first to arrive at Plaintiff's residence. The dispatch log related to the incident states that Mitchell arrived at 11:41 p.m. Mitchell stated in his affidavit, and confirmed in his deposition testimony, that when he arrived he saw Plaintiff

---

[5] The actual METCAD records included an incorrect address. However, there is no dispute that Sarah called from Plaintiff's address and the officers actually arrived at the correct address.

4

standing outside the front door of the residence and saw Sarah in the front yard.  Mitchell testified that Sarah was crying and appeared to be very upset.  Mitchell stated that Plaintiff was yelling at Sarah that he did not have her keys.  Mitchell stated that Plaintiff then closed the door.  Mitchell spoke to Sarah who told her that Plaintiff "gets violent sometimes."  Sarah told him she wanted to retrieve her keys and then leave.  Mitchell testified that he smelled an odor of alcoholic beverage from her breath or about her person.  He testified that he visually checked her for signs of physical battery and saw no bleeding, torn clothing or other signs of physical battery and Sarah said she was okay.

Mitchell, who was dressed in full Champaign police uniform, knocked on the front door of the house.  Plaintiff testified that he thought it was Sarah at the door, so he came downstairs and opened the door.  Plaintiff testified that Mitchell, who he recognized as a police officer because of his uniform, stepped into his house and backed him up.  Mitchell stated that Plaintiff opened the door and screamed "what?"  Mitchell testified that he identified himself and advised Plaintiff he was there to investigate a domestic incident.  Mitchell testified that Plaintiff attempted to close the door on him, so he put his foot in the door so Plaintiff could not close it.  Mitchell stated that he told Plaintiff to identify himself and explain what had happened.  Plaintiff testified that he was shocked by Mitchell's presence in the house.  Plaintiff asked Mitchell what he was doing in the house and told Mitchell that he needed to step out of the house.  Mitchell asked Plaintiff again for his identification and advised Plaintiff he needed to make sure no one had been battered.  Plaintiff testified that he does not recall what Mitchell was saying.  Plaintiff testified that he reached in his pocket and got his phone to call his attorney.  According to Mitchell, Plaintiff

yelled at Mitchell to leave and then pulled out a cell phone and called someone he identified as his attorney.

At 11:45 p.m., Defendant Bowersock arrived on the scene. Bowersock testified that Sarah was outside crying with clothes strewn about the ground. Mitchell motioned to Bowersock to enter the residence. According to Bowersock, Plaintiff yelled and cursed at both him and Mitchell and was flailing his arm. Bowersock testified that his understanding of the situation was that Plaintiff had taken Sarah's keys and refused to return them to her. Plaintiff testified that he did not see a second officer come into his home. Plaintiff testified that he spoke to his attorney on his cell phone and told him that he had a police officer in his home and the officer would not leave. His attorney told him to ask if the officer had a warrant, so he asked Mitchell if he had a warrant and Mitchell said no. Plaintiff testified that his attorney also told him to ask if he was under arrest. He asked Mitchell, and Mitchell said no. Plaintiff testified that Mitchell then threw him to the ground, even though he did not do anything to resist the arrest, and Mitchell busted his head into the floor. Plaintiff testified that his cell phone went flying across the room. Plaintiff testified that Mitchell handcuffed him, yanked him off the ground and hauled him to the squad car. Plaintiff testified that, at that time, he did not see another officer.[6]

Bowersock stated that he told Plaintiff to end the cell phone conversation and speak to Mitchell. Bowersock stated that he told Plaintiff they were investigating a reported domestic incident and Plaintiff needed to identify himself. Bowersock testified that Plaintiff

---

[6] Plaintiff has not disputed, however, that Bowersock had arrived on the scene at 11:45 p.m. and had entered the residence.

6

did not acknowledge him.  Bowersock stated that he told Plaintiff that the phone call needed to end or Plaintiff would be arrested.  When Plaintiff refused to complete his phone conversation, Bowersock advised Plaintiff he was under arrest.  Bowersock stated that Plaintiff then tensed his muscles and said, "No I am not, I haven't done anything, this is my house, get the fuck out of my house."  Bowersock stated that Plaintiff began to physically try and pull away and he and Mitchell took Plaintiff to the ground.  Mitchell stated that Plaintiff struggled with them and Mitchell and Bowersock took him to the ground.  Mitchell stated that he never touched Plaintiff's head during the struggle to arrest him and any contact Plaintiff's head had with the floor was inadvertent.  According to the dispatch log, Plaintiff was arrested at 11:46:43, less than two minutes after Bowersock arrived on the scene. Mitchell and Bowersock stated that Plaintiff resisted being handcuffed and struggled with them while being escorted to the police car.  In her affidavit, Sarah stated that she could hear Plaintiff being combative and yelling at the police officers while they were in the house and that she saw him struggling with the officers when they escorted him outside of the house in handcuffs.  Plaintiff testified that he was compliant with the officers.

Plaintiff's attorney, Todd Reardon, stated in his affidavit that he received a telephone call from Plaintiff around 11:35 p.m. on May 31, 2008.  Reardon stated that, after Plaintiff had asked Mitchell if he had a warrant and if Plaintiff was under arrest and Mitchell replied, "No, I just want to talk to you," Reardon told Plaintiff "he did not have to talk with the officer, that the Officer had no right to be in the house and he could just tell the officer to get the fuck out of the house."  Reardon stated that he heard Plaintiff say, "Just get the fuck out of my house, my attorney says you have no right to be in here."  Reardon also heard Plaintiff

7

say in a firm voice but not yelling or screaming, "if you do not have a warrant get the fuck out of my house." Reardon stated that the then heard Mitchell yell, "I've had enough of this shit" and then the phone went dead.[7]

Mitchell stated that he noticed blood on Plaintiff's forehead when Plaintiff was in the backseat of the police vehicle. Bowersock testified that, after Plaintiff was arrested and placed in the squad car, he calmed down and said that he did not know where Sarah's keys were. Plaintiff then gave Sarah permission to go into the house and look for her keys. Bowersock testified that Sarah said she was going to have someone come and pick her up. Mitchell stated that he transported Plaintiff to the Champaign County satellite jail. According to Mitchell, Plaintiff cleaned up the cut and stated that he did not require any medical attention. Plaintiff was booked for resisting or obstructing a peace officer and domestic violence. He was later charged with resisting a peace officer, a misdemeanor. All charges were eventually dismissed on the State's motion. Plaintiff testified that he found Sarah's keys about three days after May 31, 2008, between the washer and dryer at his house. Plaintiff stated that he later had surgery to remove a cyst from the spot where he was injured above his left eye and also sought psychiatric counseling to help him deal with the emotional distress from this incident.

## PROCEDURAL HISTORY

On May 24, 2010, Plaintiff filed a Complaint (#1) against Defendants and the City of Champaign. On January 27, 2011, Plaintiff filed an Amended Complaint (#12), brought

---

[7] Reardon went on to recount his reasons for believing that Bowersock was not present in the house at that time.

pursuant to 42 U.S.C. § 1983.  Plaintiff alleged that one or both of the Defendants forcefully pushed their way into his house.  He alleged that Defendants had no search warrant for the premises and no arrest warrant for Plaintiff and Plaintiff refused to consent to an entry into his home.  Plaintiff alleged that he informed Defendants that he did not want to talk to them and informed them that his attorney advised him to tell Defendants to leave.  Plaintiff alleged that one or both of the Defendants attacked him, threw him to the floor, slammed his head into the floor, handcuffed him and yanked his hands up over his head while he was in handcuffs, all of which caused great physical pain, mental distress and injury to Plaintiff.  In Count I, Plaintiff alleged illegal seizure, stating that he was arrested without probable cause or a warrant.  In Count II, Plaintiff alleged excessive force, stating that Defendants used excessive physical force against Plaintiff.  In Count III, Plaintiff alleged arrest in retaliation for speech, stating that he was arrested solely in retaliation for his actions of calling an attorney and for asserting his Fourth Amendment right to privacy of his home, in violation of his First Amendment rights.  In Count IV, Plaintiff alleged a state law claim of battery, stating that Defendants inflicted a harmful and offensive touching on Plaintiff.  In Count V, Plaintiff alleged a state law claim of willful and wanton misconduct, stating that Defendants acted with utter indifference to or conscious disregard for Plaintiff's safety.  In Count VI, Plaintiff alleged a state law claim of false imprisonment, stating that Defendants prohibited him from talking to an attorney on the telephone, physically grabbed him and handcuffed him, and forced him to leave his home under threat of force and bodily injury.  Plaintiff also included other claims in Counts VII, VIII, IX, and X, which included claims against the City of Champaign.

9

On February 25, 2011, Defendants filed a Motion to Dismiss Amended Complaint (#15). On May 25, 2011, Magistrate Judge David G. Bernthal entered a Report and Recommendation (#22) which recommended granting the motion in part and denying it in part. The parties did not file objections. On June 15, 2011, this court entered an Order (#23) and accepted Judge Bernthal's Report and Recommendation. This court dismissed Counts VII, VIII, IX, and X, as well as all of Plaintiff's claims under the Illinois Constitution and the Illinois Civil Rights Act of 2006.[8] On June 29, 2011, Defendants filed their Answer and Affirmative Defenses (#24).

On March 5, 2012, Defendants filed their Motion for Summary Judgment (#36), with attached exhibits. Defendants argued that they were entitled to summary judgment on Plaintiff's remaining claims because the facts show that they had probable cause to arrest Plaintiff and did not use excessive force. On May 21, 2012, Plaintiff filed his Response to Defendants' Motion for Summary Judgment (#42), with attached exhibits. Plaintiff argued that there was no probable cause to arrest Plaintiff, as a matter of law, and also argued that the facts which may determine whether there was probable cause are in dispute. In addition, Plaintiff argued that Defendants are not entitled to summary judgment on Plaintiff's claims related to excessive force. Plaintiff stated that this court cannot make credibility findings in ruling on Defendants' Motion for Summary Judgment and therefore must accept his testimony that he was compliant yet was taken to the floor and sustained a bleeding injury to his eye. On June 4, 2012, Defendants filed their Reply Brief (#44). Defendants argued  they were

---

[8] At that point, the City of Champaign should have been terminated as a party to this action.

entitled to summary judgment on all counts.  Defendants also argued that, because Plaintiff and his former attorney, Reardon, provided sworn statements that Bowersock had nothing to do with Plaintiff's arrest, summary judgment should be granted in Bowersock's  favor at the very least.

On June 15, 2012, Plaintiff filed a Motion for Summary Judgment (#45).  Plaintiff set out a lengthy rendition of the facts which, for the most part, recounted his version of events and ignored Defendants' version of events.  Plaintiff then argued that there were no material facts in dispute and he was entitled to judgment as a matter of law.  Plaintiff argued that Defendants violated Plaintiff's Fourth Amendment rights when they entered his home and arrested him, so he was entitled to summary judgment in his favor on Count I of his Amended Complaint.  Plaintiff also argued that he was entitled to judgment in his favor on Counts II through VI.  Plaintiff recognized, however, that this "court's role is not to sift through the evidence pondering the nuances and inconsistencies, and decide whom to believe," citing Johnson v. Franks, 2011 WL 841049, at *1 (C.D. Ill. 2011).  On July 2, 2012, Defendants filed their Response (#46).  Defendants noted that it was ironic that Plaintiff recognized that it is not this court's role to ponder inconsistencies or decide who to believe when Plaintiff himself has provided abundant inconsistencies.  Defendants argued that there is no real doubt as to what happened on the evening in question and this court should deny Plaintiff's Motion for Summary Judgment and grant their Motion for Summary Judgment.  On July 14, 2012, Plaintiff filed a Reply Brief (#47).  Plaintiff argued that the relevant material facts support summary judgment in his favor on all counts of his Amended Complaint.  The Motions for Summary Judgment are fully briefed and ready for ruling.

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc.,  477 U.S. 242, 255 (1986); Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010).  Therefore, when considering cross motions for summary judgment, as is the case here, a court's review of the record requires that it "construe all inferences in favor of the party against whom the motion under consideration is made." Rosenbaum v. White, 692 F.3d 593, 599 (7th Cir. 2012), quoting Allen v. City of Chicago, 351 F.3d 306, 311 (7th Cir. 2003).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See Singer, 593 F.3d at 533.

Further, "[i]n a § 1983 claim, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).  In addition, in order to not only avoid summary judgment in favor of Defendants but obtain summary judgment in his favor on his claims,

Plaintiff must establish that he is entitled to judgment "by showing there is no material dispute of fact as to every one of the elements of the cause of action asserted in those claims." Powers v. Bd. of Trs. of Univ. of Ill., 2011 WL 577108, at *5 (C.D. Ill. 2011).  This is a difficult burden for a plaintiff to meet.  See Powers, 2011 WL 577108, at *5, citing Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc., 2009 WL 3713345, at *6 (N.D. Ill 2009).  Plaintiff has the ultimate burden of persuasion to demonstrate he is entitled to judgment on his claims as a matter of law. Powers, 2011 WL 577108, at *5.  It has been recognized that "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999); see also Frobose v. Am. Sav. Loan Ass'n of Danville, 152 F.3d 602, 615 (7th Cir, 1998) (recognizing that questions of intent and credibility make it difficult to grant summary judgment in favor of the party with the burden of proof).

## II.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  FALSE ARREST CLAIMS

In his Amended Complaint (#12), Plaintiff alleged in Count I that Defendants subjected him to an illegal seizure in violation of his constitutional rights.  He alleged in Count III that he was arrested in violation of his First Amendment right of free speech.  In Count VI, Plaintiff also alleged a state law claim of false imprisonment.  Defendants have argued that they acted reasonably under the circumstances and are entitled to summary judgment on all of these claims.  Plaintiff has argued, stridently, that Defendants' conduct in entering his home

13

and arresting him was unreasonable.

"The right to be free from unwanted intrusion into one's home is chief among the protections of the Fourth Amendment." <u>Wiek v. City of Chicago</u>, 2012 WL 366569, at *2 (N.D. Ill. 2012), <u>citing</u> <u>Payton v. New York</u>, 445 U.S. 573 (1980); <u>see also</u> <u>Welsh v. Wis.</u>, 466 U.S. 740, 748 (1984).  Answering a knock at the door does not extinguish one's right to privacy and solitude in the home.  <u>Sparing v. Vill. of Olympia Fields</u>, 266 F.3d 684, 690 (7th Cir. 2001).  "Consent to enter a suspect's home - regardless of how it is expressed - cannot be coerced 'by explicit or implicit means, by implied threat or covert force.'" <u>Wiek</u>, 2012 WL 366569, at *3, <u>quoting</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 228 (1973).  This court therefore agrees with Plaintiff that the fact that he opened the door, not knowing a police officer was at the door, and thereby allowed Mitchell inside, does not mean that he voluntarily consented to the entry into his home.  <u>See</u> <u>Wiek</u>, 2012 WL 366569, at *3, <u>citing</u> <u>United States v. Berkowitz</u>, 927 F.2d 1376, 1387 (7th Cir. 1991); <u>see also</u> <u>Sparing</u>, 266 F.3d at 689-90.

However, a warrantless entry into a home is "allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." <u>See</u> <u>United States v. Jenkins</u>, 329 F.3d 579, 581 (7th Cir. 2002); <u>Wiek</u>, 2012 WL 366569, at *4.  Exigent circumstances are narrowly defined as: (1) when officers are in hot pursuit of a fleeing felon; (2) to prevent the imminent destruction of evidence; (3) to prevent a suspect's escape; or (4) to address the risk of danger to the police or to other persons inside or outside the dwelling.  <u>Minnesota v. Olson</u>, 495 U.S. 91, 100 (1990); <u>Wiek</u>, 2012 WL 366569, at *4.

Plaintiff has cited <u>Biernacki v. Carter</u>, 1996 WL 727396 (N.D. Ill. 1996), and argues

14

that there were no exigent circumstances in this case which justified entry into Plaintiff's home.  Biernacki, in fact, involved a very similar situation.  In Biernacki, Jacqueline Chiaro called 911 and reported that she was the plaintiff's girlfriend, that she was at his home, and that he was hiding her car keys and was refusing to give them to her.  Biernacki, 1996 WL 727396, at *1.  When the defendant police officers arrived at the home, Chiaro was waiting for them outside the home.  Id.  According to the defendants, Chiaro told the officers the plaintiff had her car keys and she could not leave without them.  Id.  The defendants claimed that she was mad, fearful, and wanted help in retrieving her keys.  Id.  The plaintiff maintained that Chiaro did not have any visible injuries or signs of domestic abuse and told the defendants the plaintiff was not violent and did not possess any weapons.  Id.  The defendants then went to the door with Chiaro and knocked on the door.  Id.  The plaintiff came to the door and was asked to return Chiaro's car keys.  Id. at *2.  The plaintiff responded that he did not have her keys.  Id.  Chiaro said she thought she could find her keys inside the house and the plaintiff opened the screen door for her and she walked into the house.  Id.  The defendants then attempted to enter the home and the plaintiff told them they could not come in.  Id.  The defendants entered the house by moving the plaintiff backwards to a wall in the entryway.  Id.  One of the defendants held the plaintiff against the wall and warned the plaintiff not to obstruct justice.  Id.  The plaintiff then stepped sideways, away from the defendant and the door.  Id.  The defendants arrested the plaintiff and charged him with obstructing a peace officer.  Id.

Based on these facts, the district court found that there was a material question as to whether the defendants' attempt to enter the plaintiff's home was an authorized act.  Id. at *4.

15

The court stated that, if the defendants were not performing an authorized act, the plaintiff could not have been validly arrested for obstructing them.  Id.  The court found that the defendants' argument that there were exigent circumstances because they needed to enter the house to "defuse the situation" was not "enough to say as a matter of law defendants were justified in entering plaintiff's home."  Id.  The district court therefore found that the defendants were not entitled to summary judgment.  Id.

While there certainly are similarities between the facts of this case and the facts of Biernacki (most notably, lost keys), there are also significant differences.  In this case, Sarah reported that Plaintiff had been violent in the past and that she did not know if Plaintiff had weapons in the house.  Also, Sarah was not only locked outside of the house, crying, there were also clothes strewn about the ground, indicating more than just a verbal argument.

In determining whether there were exigent circumstances in this case, this court must assess whether the police were unreasonable in not getting a warrant in the circumstances that confronted them.  Reardon v. Wroan, 811 F.2d 1025, 1029 (7th Cir. 1987), quoting Llaguno v. Mingey, 763 F.2d 1560, 1564 (7th Cir. 1985); see also United States v. Sodagar, 2008 WL 4865577, at *3 (N.D. Ill. 2008), aff'd 422 Fed. Appx. 530 (7th Cir. 2011).  The court must consider "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape."  Biernacki, 1996 WL 727396, at *4, quoting Llaguno, 763 F.2d at 1564; see also Sodagar, 2008 WL 4865577, at *3.  "The subjective belief of the officers on the scene does not matter; it only matters whether it would be reasonable to think that circumstances required a warrantless entry."  Sodagar, 2008 WL 4865577, at *3, citing Brigham City, Utah v. Stuart, 547 U.S. 398,

16

404 (2006).  "Moreover, '[a]n officer on the beat must be allowed latitude to make snap judgments, subject to the requirement of reasonableness.'" <u>Sodagar</u>, 2008 WL 4865577, at *3, <u>quoting</u> <u>United States v. Brown</u>, 64 F.3d 1083, 1086 (7th Cir. 1995).  "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties."  <u>Brigham City</u>, 547 U.S. at 406; <u>see also</u> <u>Georgia v. Randolph</u>, 547 U.S. 103, 118 (2006) ("it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur").  The Seventh Circuit has stated that 911 calls fit "neatly within a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance."  <u>United States v. Richardson</u>, 208 F.3d 626, 629 (7th Cir. 2000).

In this case, Defendants were at Plaintiff's home because of Sarah's 911 call.  During this call, Sarah reported that she and Plaintiff had argued and she was locked out of Plaintiff's house and could not get her keys.  Sarah also reported that Plaintiff had a history of abusiveness and she did not know if there were weapons in the house.  When Defendants arrived, Sarah was upset and crying and her clothes were strewn about the ground.[9]  This court concludes that, from Defendants' perspective, they reasonably could have anticipated that if they left the scene, the conflict could reignite and Sarah could be in danger.  <u>See</u> <u>Sodagar</u>,

---

[9]  In ruling on Defendants' Motion for Summary Judgment, this court must construe the evidence in the light most favorable to Plaintiff.  Therefore, this court has not considered Mitchell's testimony that Plaintiff was yelling at Sarah when Mitchell arrived and has accepted Plaintiff's testimony that he was upstairs in bed when Mitchell arrived.

2008 WL 4865577, at *4.  The definition of exigent circumstances includes the need to address the risk of danger to the police or to other persons inside or outside the dwelling.  See Olson, 495 U.S. at 100; Wiek, 2012 WL 366569, at *4.  This court concludes that it would not be reasonable to respond to a domestic situation call and leave the reporting victim out on the front yard, just before midnight, with no keys and with clothes all over the yard.[10]  In fact, Judge Bernthal concluded in his Report and Recommendation (#22) that "Defendants could lawfully enter Plaintiff's home to help Plaintiff's girlfriend, who had asked for assistance to collect her belongings."  Plaintiff did not object to the Report and Recommendation and it was accepted by this court.  Accordingly, this court concludes that Defendants were justified in entering Plaintiff's house for the purpose of asking him questions about the situation. Therefore, under the circumstances here, the entry was not a violation of Plaintiff's Fourth Amendment rights.  See United States v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005); Sodagar, 2008 WL 4865577, at *4-5.

The next question is whether Defendants violated Plaintiff's constitutional rights when they arrested him.  "Probable cause is an absolute defense to a wrongful arrest claim asserted under § 1983 against police officers."  Padula v. Leimbach, 656 F.3d 595, 601 (7th Cir. 2011). "A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person,

---

[10]  This court notes that Plaintiff has insisted that Defendants should have just told Sarah to call a cab and leave.  This court concludes that this would not have been a reasonable response to the situation.  Plaintiff has also argued that it was not reasonable for Defendants to help an admittedly intoxicated person retrieve her car keys "so she could drive away, intoxicated." However, this court concludes Defendants were trying to investigate the situation and make sure that Sarah was not in any danger.  In fact, Mitchell testified that he told Sarah not to drive that night because she had reported being intoxicated.

or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Padula, 656 F.3d at 601, quoting Chelios v. Heavener, 520 F.3d 678, 686 (7th Cir. 2008). "In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer." Padula, 656 F.3d at 601, quoting Chelios, 520 F.3d at 686.

In this case, this court has concluded that Defendants's entry into the home to ask Plaintiff questions about the situation did not violate Plaintiff's constitutional rights. The evidence shows that, when Defendants entered the home, they attempted to get information from Plaintiff about the situation and Plaintiff refused to provide any information. This court concludes that Defendants then had probable cause to arrest Plaintiff for either theft of Sarah's keys or disorderly conduct.[11]  Based on the information Mitchell had at the time he entered Plaintiff's residence, Sarah had requested assistance in getting her keys from Plaintiff and reported that he had been physically abusive with her in the past. Mitchell therefore had probable cause to believe that Sarah needed assistance retrieving her keys because Plaintiff would not return them to her.

In addition, to commit the offense of disorderly conduct under Illinois law, "a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace." Reher v. Vivo, 656 F.3d 772, 775 (7th Cir. 2011), citing 720 Ill. Comp. Stat. 5/26-1(a)(1) (West 2012). In this case, Defendants

---

[11] Plaintiff has argued that "at the very worst, theft of a set of keys is a very minor offense." However, contrary to Plaintiff's arguments, Defendants did not have to have probable cause to believe that Plaintiff had committed a felony in order to arrest him, they just needed probable cause to believe he had committed an offense.

knew that Sarah was outside the house, crying, with clothes about the ground, and had called 911 to help her retrieve her keys from Plaintiff, reporting that Plaintiff had a history of abusiveness.  Sarah also told Mitchell that Plaintiff got violent sometimes.  There is no genuine dispute about the information that Defendants had at the scene.  This court recognizes that Plaintiff has stated that, when Sarah is intoxicated, she blames others and lies.  However, Defendants were not given this information at the scene because Plaintiff did not talk to them.[12]

This court concludes that the information Defendants had was sufficient for Defendants to have probable cause to arrest Plaintiff for engaging in unreasonable conduct which alarmed Sarah and provoked a breach of the peace.  See Reher, 656 F.3d at 776-77; see also Anderson v. City of West Bend Police Dep't, 774 F. Supp. 2d 925, 944-45 (E.D. Wis. 2011).  Mitchell entered Plaintiff's house and did not immediately arrest Plaintiff but rather attempted to talk to him about the situation.  It is undisputed that Plaintiff refused to identify himself or talk to Mitchell and insisted that Mitchell leave his house.  After Bowersock entered the house and Plaintiff refused to get off the phone and talk to them, Defendants arrested him.  This court concludes that Defendants had probable cause to arrest Plaintiff, so Defendants are entitled to summary judgment on Plaintiff's claim of false arrest.

As for Plaintiff's First Amendment retaliation claim, Plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered an adverse action that would likely deter future First Amendment activity; and (3) the First Amendment activity was

---

[12]  This court therefore concludes that, unlike the situation in Johnson v. Franks, 2011 WL 841049, at *6 (C.D. Ill. 2011), which was cited by Plaintiff, Defendants did not have "other information that cast significant doubt on the reliability" of the complaining witness.

"at least a motivating factor" in the defendants' decision to retaliate.  Santana v. Cook County Bd. of Review, 679 F.3d 614, 622 (7th Cir. 2012).

In analyzing a First Amendment retaliation claim arising under § 1983, this court must first determine whether Plaintiff's speech was constitutionally protected. Doyle v. Chief Judge of the Tenth Judicial Circuit, 2007 WL 2572387, at *4 (C.D. Ill. 2007), citing Sigsworth v. City of Aurora, Ill., 487 F.3d 506, 509 (7th Cir. 2007).   Plaintiff has argued that he had a constitutional right to consult with his attorney for legal advice as to his rights.  This court does not agree.  Plaintiff has relied on an Illinois statute, which states that a person "committed, imprisoned or restrained of his liberty for any cause whatever" shall be allowed to consult with a licensed attorney.  725 Ill. Comp. Stat. 5/103-4 (West 2010).  This court agrees with Defendants that this portion of the Illinois Code of Criminal Procedure of 1963 relates to individuals who have already been placed in custody, not someone like Plaintiff who was just being asked to identify himself and provide information about the situation.

Moreover, in any event, the statute does not create a constitutional right.  This court notes that it is "well-established that the Sixth Amendment right of an accused person 'to have the Assistance of Counsel for his defence,' U.S. Const. Amend. VI, attaches at 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Thompkins v. Pfister, ___ F.3d ___, 2012 WL 5200352, at *5 (7th Cir. 2012), quoting Kirby v. Ill., 406 U.S. 682, 689 (1972).  Therefore, this court agrees with Defendants that Plaintiff's argument is without merit.  Defendants have pointed out that Plaintiff's interpretation of the right to contact counsel would severely hamper the ability of police officers to enforce the law.  This court agrees that "[i]t is simply

not true that someone facing arrest can merely call his attorney on speed dial and have a leisurely conversation with that attorney requiring the officers to stand by and allow him to seek advice before the arrest is made." For these reasons, Defendants are entitled to summary judgment on Plaintiff's claim in Count III that his arrest violated his First Amendment rights.

In addition, Plaintiff is correct that his state law claim of false imprisonment in Count VI falls under the same analysis as his claim of illegal seizure in Count I. In carefully analyzing Plaintiff's claim in Count I, this court concluded that Defendants did not violate Plaintiff's rights when they entered his home and that Defendants had probable cause to arrest Plaintiff. Therefore, because Defendants are entitled to summary judgment as to Count I, they are entitled to summary judgment as to Count VI as well.

## B. EXCESSIVE FORCE CLAIMS

In his Amended Complaint (#12), Plaintiff alleged in Count II that Defendants violated his constitutional rights by using excessive force against him. In Count IV, Plaintiff alleged that Defendants were liable under state law for battery because they "inflicted a harmful and offensive touching on Plaintiff." In Count V, Plaintiff alleged that Defendants caused his injuries and thereby engaged in willful and wanton conduct in violation of Illinois law. This court agrees with Defendants that, under the Illinois Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act), Defendants cannot be liable for battery unless their conduct is shown to be willful and wanton. 745 Ill. Comp. Stat. 10/2-202 (West 2010) ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.") Therefore, because willful and wanton conduct is not, in and of itself, a tort recognized under

22

the law of Illinois, Counts IV and V must be read together to allege common law battery claims which avoid the application of the Illinois Tort Immunity Act.

Defendants have argued that they are entitled to summary judgment on these claims because the undisputed facts show that they acted reasonably in arresting Plaintiff and had to take him to the ground because he was actively resisting arrest.  In evaluating an excessive force claim under the Fourth Amendment's reasonableness standard, "[t]he dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." Padula, 656 F.3d at 602, quoting McAllister, 615 F.3d at 881.

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers[,] violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Padula, 656 F.3d at 602, quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989). Defendants insist that they were patient with Plaintiff and reacted reasonably to his yelling, flailing arm, and complete refusal to cooperate with them.

Defendants have acknowledged that Plaintiff testified that he did nothing to resist arrest and has claimed that he was compliant at all times.  Defendants argued that this testimony cannot be credited because Plaintiff had an incomplete recollection of the events of the evening in question and because his testimony was directly contradicted by both Defendants and Sarah.  However, "of course, a district court may not weigh the evidence at

23

the summary judgment stage; it must view the evidence in the light most favorable to the non-movant." George v. Kraft Foods Global, Inc., 641 F.3d 786, 799 (7th Cir. 2011).  Plaintiff testified that Mitchell threw him to the ground, even though he did not do anything to resist the arrest, and  busted his head into the floor, causing a bleeding injury.  This court must therefore agree with Plaintiff that, construing the evidence in his favor as it must in ruling on Defendants' Motion for Summary Judgment, there are genuine issues of material fact regarding whether Defendants used excessive force in arresting Plaintiff.

In their Reply, Defendants have raised an interesting point.  According to Plaintiff's deposition testimony, he did not see Bowersock arrive and enter his house.  Plaintiff also provided this court with Reardon's affidavit in which Reardon sets out the reasons he believes only Mitchell was in the house when Plaintiff was arrested.  Nevertheless, Plaintiff included false arrest and excessive force claims against Bowersock in his Amended Complaint. Defendants have made a persuasive argument that Bowersock is entitled to summary judgment because, according to Plaintiff, he was not even there when Plaintiff was arrested and allegedly thrown to the ground.

However, Plaintiff has pointed out that both Defendants admitted that they took Plaintiff to the floor when they arrested him.  Bowersock did testify that he was in Plaintiff's house and participated in arresting Plaintiff and taking him to the ground.  Therefore, this court concludes that, based upon the facts before the court, Bowersock is not entitled to summary judgment on Plaintiff's claims of excessive force and battery involving willful and wanton conduct.

### III.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment (#45), Plaintiff argued that there are no material facts in dispute and he is entitled to summary judgment as a matter of law on all of his claims. This court does not agree.  As far as his claims related to false arrest, this court has already concluded that Defendants are entitled to summary judgment.  As far as his claims related to the use of excessive force, this court has already concluded that genuine disputes of material fact preclude summary judgment for Defendants.  The same is true for Plaintiff.  While Plaintiff insists that he was compliant at all times and was slammed to the ground for no reason, Defendants' evidence presents a different version of events.  Moreover, it is more difficult for Plaintiff, who has the burden of proving his claims, to show that he is entitled to judgment as a matter of law.  See Powers, 2011 WL 577108, at *5.  Therefore, Plaintiff's Motion for Summary Judgment (#45) is DENIED.

IT IS THEREFORE ORDERED THAT:

(1) The City of Champaign is terminated as a party to this action.

(2) The Motion for Summary Judgment (#36) filed by Defendants Rodney S. Mitchell and James M. Bowersock is GRANTED, in part, and DENIED, in part.  Judgment is entered in favor of Defendants and against Plaintiff on Counts I, III, and VI of his Amended Complaint.  Summary judgment is denied as to Counts II, IV, and V.

(3) The Motion for Summary Judgment (#45) filed by Plaintiff William K. Hawkins is DENIED.

(4) This case is scheduled for a telephone status conference on November 29, 2012, at 3:30 p.m. so that a final pretrial conference and jury trial can be scheduled on the claims that remain in this case.

25

ENTERED this <u>15th</u> day of <u>November</u>, 2012.


s/MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE